**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **DROPLETS, INC.,** | § | Civil Action No. 2:24-cv-00968-JRG |
| Plaintiff, | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| **FORD MOTOR COMPANY,** | § | |
| Defendant. | § | |

# AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff Droplets, Inc. ("Droplets") files this Amended Complaint for patent infringement against Defendant Ford Motor Company ("Ford"), and alleges as follows:

## NATURE OF THE ACTION

1. Droplets is an innovative software development corporation focused on technology for developing and delivering highly functional and scalable applications over the Internet. As a result of this leading-edge development, Droplets received patents on its platform, which includes deployment of rich internet applications and related technology. Droplets has sold products based on its technology to Global 1000 enterprises, U.S. armed services, independent software vendors, and application service providers.

2. Droplets claims that Ford infringed Droplets' U.S. Patent No. 6,687,745 ("the '745 patent" or "the Asserted Patent," Exhibit 1).

## PARTIES

3. Droplets is a corporation organized and existing under the laws of Delaware, with its principal place of business at 16052 FM 3062, Bldg. 2, Malakoff, Texas 75148.

4. On information and belief, Ford is a corporation organized under the laws of Delaware, with its principal place of business at One American Road, Dearborn, Michigan. Ford may be served with process by serving its registered Texas agent, CT Corp System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

## JURISDICTION AND VENUE

5. This is a civil action asserting a claim of patent infringement of the ’745 patent. This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Ford. Ford has continuous and systematic business with the State of Texas and within the Eastern District of Texas. Ford, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), made, used, offered for sale, sold, imported, advertised, made available, and/or marketed products and services within the Eastern District of Texas through which it infringed the patent-in-suit, such as through its www.ford.com website and/or other Ford owned or controlled websites.

7. On information and belief, Ford maintains its U.S. Central Market Area Office at 5700 Granite Parkway, Suite 1000, Plano, Texas 75024, which is located in this District. Ford describes this office as “the principal office of Ford in the State of Texas” where “the decision makers for [Ford] within this state conduct the daily affairs of the organization.” *Ford Motor Co. v. Johnson*, 473 S.W.3d 925, 927 (Tex. App.—Dallas 2015, pet. denied).

8. Ford also maintains regular and established places of business in this District through its authorized dealerships, including Marshall Ford, located at 4200 East End Blvd. S., Marshall, Texas 75672. Ford ratifies and holds these authorized Ford dealers out as the regular and established places of business of Ford in this District by listing each of them in Ford’s sales directories and on Ford’s website(s). Moreover, Ford, through the Ford Website directs users to shop for Ford products in this District, including, e.g., as shown below:




Exhibit 3, https://www.ford.com/dealerships/?gnav=header-shop-fd#/q/75670/radius/50.

9. On information and belief, Ford further ratifies and holds these authorized Ford dealers out as the regular and established places of business of Ford in this District by requiring these authorized dealers to feature and use Ford's names, branding, trademarks, and/or trade dress, including in each of these authorized dealers' names, *e.g.*, Marshall Ford, located at 4200 East End Blvd. S., Marshall, Texas 75672; Tyler Ford, located at 2626 S SW Loop 323, Tyler, Texas 75701; and Lufkin Ford, 800 N Medford Dr, Lufkin, Texas 75901.

10. Venue is appropriate in the Eastern District of Texas under 28 U.S.C. §§ 1391, 1400, and 1404. Ford has a regular and established place of business in this District, including its U.S. Central Market Area Office at 5700 Granite Parkway, Suite 1000, Plano, Texas 75024. Ford further maintains regular and established places of business in this District through its authorized dealerships. *E.g.*, Exhibit 3.

11. On information and belief, Ford also committed acts of infringement in this District. Ford committed its infringing performance of the claims, as shown below, in this District, at least by, on information and belief, providing the Ford Website in this District (to users in this District),

providing content from servers located in this District (including edge servers located in this District), and providing the Ford Website from this District.

12. On information and belief, Ford recruits software engineers in this District. *E.g.,* Exhibit 4, https://fordcareers.dejobs.org/austin-tx/senior-software-development-engineer-android/D0EE02E248D647788B8F0B8A0EFEDE72/job/.

13. Moreover, on information and belief, Ford's customers and users used the Ford Website in this District.

## BACKGROUND

14. Plaintiff Droplets is an innovative software company founded in 2000. Droplets invented a fundamentally novel way for webpages to work.

15. When Droplets was first formed, less than half of Americans had access to the Internet, and for those who did, it was through a very slow connection called "dial-up" that sent data over telephone lines. As a result of the limited bandwidth connections, webpages could take a minute or more to load, even though they generally consisted of just text and images. Notably, webpages were static—for any part of a webpage to change, the entire webpage had to be re-loaded.

16. It was in this context that Droplets' patented technology was developed. In the mid-to-late 1990's, the inventors were working at a company called SphereSoft, where they were developing an online tool for stock traders. The goal was for stock traders to be able to access stock prices and execute trades over the Internet. While this is now commonplace, it was simply not possible at the time. Webpages could display stock prices, but in order to get the current stock price, the entire webpage would have to be refreshed. Due to the slow speed of the Internet, that would take a minute or longer, at which point the stock price was often out of date. For high-stakes stock traders, waiting a minute could be the difference between making or losing millions of dollars. The same was true with webpages designed to execute stock trades—the delays caused by constantly re-loading a

webpage meant that stock traders were always behind the stock market, which resulted in lost opportunities. The standard website technology at the time was simply not able to provide a viable online stock tool.

17. The inventors addressed these problems by developing a fundamentally novel way for webpages to work. The basic concept is straightforward: instead of always updating an entire webpage, update just the relevant part of the webpage; rather than having to download an entire webpage to get an updated stock price, download and refresh only the numbers for the updated stock prices. Because this information constitutes a small amount of data, it can be sent to the client every second, even using the slow dial-up connections of the time. This enabled, for the first time, an Internet webpage that could provide real-time stock price information and allow traders to buy and sell stocks without the webpage ever re-loading.

18. The inventors quickly realized that their invention had much broader applicability than a stock trading application. In 2000, they formed a new company, Droplets, that was focused on providing their novel technology to companies worldwide. Droplets raised millions of dollars in angel/venture capital in the early 2000s for product development and sales efforts. In addition to its stock trading application, Droplets developed online mail and messaging applications, and provided a platform for developing webpages that could provide any type of online application. What Droplets was selling, in essence, was the ability to develop the dynamic, interactive webpages that we take for granted today.

19. Droplets received multiple patents on its unique software design. The first was awarded in 2004 and several more followed in 2009 and 2013. The first of these patents to be granted, U.S. Patent No. 6,687,745, is at issue in this case.

20. Droplets' product was gaining traction in the market, selling millions of dollars in products and services to a broad range of customers. However, major technology, retail, and finance

companies began using Droplets' technology in their webpages without authorization. Droplets first filed a lawsuit against Adobe in 2006, alleging infringement of the Asserted Patent as well as trade secret misappropriation. Droplets proceeded to file additional cases against major companies for their infringement in 2011. In early 2015, Droplets obtained a favorable jury verdict in the Eastern District of Texas against three companies, the retailers Sears, Overstock, and Kmart. In March 2022, Droplets obtained another favorable jury verdict in the Northern District of California against Yahoo! Inc., in which the jury found that Yahoo! Inc. infringed the '745 Patent and awarded Droplets $15 million in damages. *See Droplets Inc. v. Yahoo! Inc.*, No. 12-cv-03733-JST, Dkt. 1125 (N.D. Cal. Mar. 29, 2022).

21. On information and belief, Ford was founded in 1903 and is among the world's largest vehicle manufacturers, operating across North America and in over 125 countries around the world, including through an array of websites and applications. Exhibit 5 (https://corporate.ford.com/operations.html). On information and belief, Ford had revenue of $176 billion in fiscal year 2023. *See* Exhibit 6. On information and belief, Ford operates its largest website at www.ford.com.

22. Ford, like other major technology and online retailers that were found to infringe the Asserted Patent, incorporated Droplets' technology into the Ford Website without authorization. Droplets seeks damages for Ford's infringement.

## THE ASSERTED PATENT

23. United States Patent No. 6,687,745, entitled "System and method for delivering a graphical user interface of remote applications over a thin bandwidth connection," was duly and

legally issued by the United States Patent and Trademark Office on February 3, 2004 after full and fair examination. The ’745 Patent expired on November 20, 2021.[1]

24. Droplets is the assignee of all rights, title, and interest in the ’745 Patent, including the right to recover damages for past infringement.

25. The ’745 Patent claims technology that allowed users to run much richer and more functional applications on their computers and devices with less bandwidth. In 1999, the time of the invention, the Internet was exploding in popularity, but there were still a number of impediments to the Internet becoming what it is today—a highly interactive and immersive experience. ’745 Patent at 2:20-3:65. For example, a user at that time could access a webpage and view its applications and information, but if the user wished to access additional applications or information, the user needed to navigate away from that webpage or open a new window, thereby taking the user away from the original webpage. *Id*. at 3:11-35. Further, once the user navigated to a new interactive webpage, then there was no consistent way for the user to retrieve that webpage in a previous state. *Id*. at 3:47-65. There were attempts to overcome this limitation through the use of applications on webpages, but this approach required the user to download the entire application. *Id.* at 17:52-57. In a time when dial-up connections were still common, this could take substantial time and negatively impact the user experience.

26. The inventors of the ’745 patent addressed these problems by not requiring the user to download all of the applications that were displayed on each webpage. Instead, the applications could be executed, at least in part, remotely. This would create a useful experience from the user’s point of view if the application could restore previous operating states. This would create the appearance and

---

[1] This Amended Complaint is only asserting infringement during the pendency of the ’745 Patent and is not asserting infringement subsequent to the ’745 Patent’s expiration.

functionality of a locally downloaded application, without the bandwidth requirements of downloading the entire application for execution on the local computer.

27. An *inter partes* reexamination of the '745 Patent was filed on August 3, 2007. On March 1, 2011, the United States Patent and Trademark Office duly and legally issued an *Inter Partes* Reexamination Certificate No. 6,687,745 C1 confirming the patentability of all claims of the '745 Patent and adding claims 27-104 determined to be patentable.

**FORD'S INFRINGING PRODUCTS AND SERVICES**

28. Upon information and belief, Ford infringed one or more claims of the Asserted Patent, acting through the Ford Website, including at least www.ford.com, and/or other Ford owned or controlled websites, subdomains thereof and constituent webpages thereof (collectively, "the Accused Products"). Ford provided a number of interactive functionalities on these Accused Products that infringed the '745 patent, including, but not limited to, the Search Suggest, Recent Searches/Search History, Menu, Location Selection, Dealership Selection, Builder, Find Charger, and Sign In features (shown below). On information and belief, Ford's Accused Products used those interactive functionalities, not limited to the Menu, Location Selection, Dealership Selection, Builder, Find Charger, Search Suggest, Recent Searches/Search History, and Sign In features, to infringe the '745 patent.




https://www.ford.com (showing Menu) (accessed November 18, 2021)




https://shop.ford.com/configure/escape/?gnav=header-suvs-bp%3Dshow-bp (showing Location Selection) (accessed November 18, 2021)




https://www.ford.com/dealerships/?gnav=header-finddealer (showing Dealership Selection) (accessed November 18, 2021)




https://shop.ford.com/configure/escape/config/paint (showing Builder) (accessed November 18, 2021)




https://shop.ford.com/configure/escape/config/paint (showing Builder) (accessed November 18, 2021)



https://www.ford.com/trucks/f150/f150-lightning/2022/?intcmp=bev-bb-reveal-f150-lightning (showing Find Charger) (accessed November 18, 2021)




https://www.ford.com/finance/apply/?gnav=header-finance (showing search features) (accessed November 18, 2021)

**COUNT I**

**(INFRINGEMENT OF THE ’745 PATENT)**

29. Droplets incorporates by reference each allegation stated in paragraphs 1 through 28 above as if fully stated here.

30. Ford infringed one or more method claims of the ’745 patent prior to its expiration, literally or under the doctrine of equivalents, under 35 U.S.C. § 271(a), by using the Accused Products in the United States to perform the claimed methods, including as shown in Exhibit 2 and herein. Exhibit 2 provides details regarding only examples of Ford’s infringement, and Droplets reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under this Court’s scheduling order.

31. As set forth in Exhibit 2, Ford performed all steps of claim 1 of the ’745 patent. In particular, Ford designed, developed and operated the accused webpages, and in so doing, delivered interactive links and other information to client computers. Leveraging the interactive links and other information, Ford was able to send messages between the client computers (e.g., via the web browsers) and various Ford-controlled servers to thereby control the presentation and display of applications on the client computers. Ford at all times controlled its webpages, including the interactive link and other information sent to the client computers, the messages sent between the client computers/web browsers and Ford’s servers, and the presentation and display of applications on the client computers. Ford could, at any time, alter the webpage experience or even offer no experience at all. While users of the client computers could elect to visit Ford’s webpages and interact with them in certain ways, the steps of claim 1 of the ’745 patent were all automatically performed by Ford through, inter alia, its transmission of messages between its servers and client computers and the execution of Ford code on Ford-controlled servers and client computers. When a client computer visits a modern webpage, the operator of the webpage typically exerts control over the client computer through the exchange of messages between its servers hosting the webpage and the client computer.[2] Neither the end user nor the client computer can modify the performance of the method steps and only Ford’s actions are involved in the performance of the method steps at issue in this action.

32. By way of example, the method step that requires “retrieving, in response to a request of a client computer, over a first communication connection first information having computer program code embedded therein . . .”, is performed automatically by the execution of Ford’s HTTP

[2] Ford sends client computers HTTP commands, which include a variety of different data that Ford uses to remotely operate a user’s computer via a browser, including HTML, CSS, and JavaScript files. *See, e.g.*, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Web_standards/The_web_standards_model (“HTML, CSS, and JavaScript are the main three technologies you'll use to build a website.”) (“JavaScript and APIs are for controlling dynamic behavior.”)

commands and Ford code and is thereby performed by Ford. Similarly, the method step that requires "sending second information relating to the operating environment of the client computer, from the client computer to the second host computer", is caused automatically by the execution of Ford's HTTP commands and Ford code and is thereby performed by Ford. The same applies for the subsequent "retrieving," "presenting," and "storing" steps of claim 1.

33. To the extent any of the steps of claim 1 are deemed to not be performed by Ford, such method step, infringement, and participation was at Ford's direction and control (via Ford's servers, commands, code, and information) in a manner that Ford conditioned the benefit of using the accused functionality on the client computer performing such steps. For example, for the method step that requires "retrieving, in response to a request of a client computer, over a first communication connection first information having computer program code embedded therein . . .", to the extent any aspect of that method step is not attributed to Ford, the method step is caused automatically by the execution of Ford's HTTP commands and Ford code and is accordingly at Ford's direction or control, with Ford conditioning the benefit of the relevant functionality (e.g., retrieving an interactive link and other information that can be used to present applications and information) on the client computer/web browser executing the relevant code and/or HTTP commands. Similarly, with respect to the method step that requires "sending second information relating to the operating environment of the client computer, from the client computer to the second host computer," to the extent any aspect of that method step is not attributed to Ford, any such aspect is caused automatically by the execution of Ford's HTTP commands and Ford code and is accordingly at Ford's direction or control with Ford conditioning the benefit of the relevant functionality (e.g., retrieving information that can be used to present applications and information) on the client computer/web browser executing the relevant code and/or HTTP commands. The same applies for the subsequent "retrieving," "presenting," and "storing" steps of claim 1. These are only exemplary theories of Ford's infringement, and Droplets

reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under this Court's scheduling order.

34. On information and belief, Ford has known, or has willfully blinded itself to, the '745 Patent and its infringement since Droplets' previous litigations and verdicts, discussed above, given the prominence and related nature of the defendants in those litigations and of the litigations themselves. On information and belief, Ford has been or was a member of RPX Corp. ("RPX"), a defensive patent aggregation service, since at least 2015. *See* Exhibit 7 (article noting Ford's RPX membership). In 2013, RPX announced that RPX "acquired sub-license rights to patents related to Web-based application delivery from rich internet application (RIA) software tools developer Droplets, Inc." *See* Exhibit 8. On information and belief, RPX's business model involves obtaining certain patent rights for its members, and RPX accordingly provides its member companies (including Ford) with regular updates about patents that might be of concern to them. Indeed, upon Droplets' filing of this action, RPX published an article about Droplets' patent and litigations. *See* Exhibit 9. Given Ford's apparent membership in RPX during Droplets' prior litigations and Ford's infringing Accused Products, it is plausible that RPX would have identified the '745 Patent to Ford such that Ford was made aware of the '745 Patent and put on notice of its potential infringement.

35. Droplets was damaged by the infringement of the '745 patent by Ford. Droplets is entitled to recover from Ford the damages sustained by Droplets as a result of Ford's wrongful acts.

36. The infringement by Ford of the '745 patent was deliberate and willful, entitling Droplets to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## DEMAND FOR JURY TRIAL

37. Droplets hereby demands a jury trial on its claims for patent infringement.

## PRAYER FOR RELIEF

WHEREFORE, Droplets respectfully requests that this Court enter judgment in its favor and grant the following relief:

A. Enter judgment that Ford infringed the '745 patent;

B. Find that such infringement was willful;

C. Award Droplets damages in an amount adequate to compensate Droplets for Ford's infringement of the '745 patent, but in no event less than a reasonable royalty under 35 U.S.C. § 284;

D. Award enhanced damages pursuant to 35 U.S.C. § 284;

E. Find that this case is exceptional and award Droplets its reasonable attorneys' fees under 35 U.S.C. § 285;

F. Order Ford to pay pre-judgment and post-judgment interest to the full extent allowed under the law; and

G. Grant such other and further relief as the Court may deem just and proper.

Dated: May 1, 2025

Respectfully submitted,

*/s/ Courtland L. Reichman*

Courtland L. Reichman – LEAD ATTORNEY
(CA Bar No. 268873)
Shawna L. Ballard
(CA Bar No. 155188)
Jennifer Estremera
(CA Bar No. 251076)
James Gordon (*pro hac vice*)
(CA Bar No. 340004)
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501
creichman@reichmanjorgensen.com
sballard@reichmanjorgensen.com
jestremera@reichmanjorgensen.com
jgordon@reichmanjorgensen.com

Jaime Cardenas-Navia (*pro hac vice*)
(NY Bar No. 5249248)
Michael Matulewicz-Crowley (*pro hac vice*)
(NY Bar No. 5428487)
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501
jcardenas-navia@reichmanjorgensen.com
mmatulewicz-crowley@reichmanjorgensen.com

Scott Cole
(Texas Bar No. 00790481)
**REICHMAN JORGENSEN LEHMAN & FELDBERG LLP**
515 Congress Avenue, Suite 1900
Austin, TX 78701
Telephone: (737) 227-3102
Facsimile: (650) 560-3501
scole@reichmanjorgensen.com

*Attorneys for Plaintiff Droplets, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on this 1st day of May, 2025, the foregoing **AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DAMAGES AND DEMAND FOR JURY TRIAL** was served via ECF on all counsel of record.

/s/ *Courtland L. Reichman*
Courtland L. Reichman